Henry Huttinger (SBN 312843)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
henry.huttinger@hbsslaw.com

Nathan W. Bear (SBN 247042)
Frank R. Schirripa*
Gwendolyn Nelson*
**HACH ROSE SCHIRRIPA & REHNS LLP**
112 Madison Avenue, 10th Floor
New York, NY 10016
Telephone: (212) 213-8311
nbear@hrsrlaw.com
fschirripa@hrsrlaw.com
gnelson@hrsrlaw.com
**pro hac vice* applications forthcoming

*Counsel for Plaintiff and the Proposed Class*

*[Additional Counsel listed on signature page]*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 501 SECURITY FUND, on Behalf of Itself and All Others Similarly Situated,

Plaintiff,

v.

ABBOTT DIABETES CARE INC. and ABBOTT LABORATORIES,

Defendants.

Case No. __________

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........ 1

II. THE PARTIES ........ 2

III. JURISDICTION AND VENUE ........ 3

IV. FACTUAL ALLEGATIONS ........ 3

- A. Accurate Glucose Monitoring Is Critical for Effective Diabetes Management ........ 3
- B. Abbott's Design and Marketing of Glucose Monitoring Devices ........ 6
- C. The Manufacturing Defect and Abbott's Prior Knowledge ........ 7
- D. The FDA Warning Letter, Findings of Adulteration, and Update on Class I Recall ........ 11
- E. The Impact on End Payors ........ 13
- F. Fraudulent Omission Allegations ........ 14

V. TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS ........ 16

VI. CLASS ACTION ALLEGATIONS ........ 17

VII. CAUSES OF ACTION ........ 20

COUNT ONE: FRAUDULENT OMISSION OR CONCEALMENT (On Behalf of Plaintiff and the Class) ........ 20

COUNT TWO: UNJUST ENRICHMENT (On Behalf of Plaintiff and the Class, in the Alternative) ........ 22

COUNT THREE: BREACH OF EXPRESS WARRANTY (On Behalf of Plaintiff and the Class) ........ 23

COUNT FOUR: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (On Behalf of Plaintiff and the Class) ........ 24

COUNT FIVE: VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT ("CLRA") – Cal. Civ. Code § 1750, *et seq*. (On Behalf of Plaintiff and the Class) ..... 25

COUNT SIX: VIOLATION OF THE MAGNUSON MOSS FEDERAL WARRANTY ACT 15 U.S.C. § 2301, *et seq*. (On Behalf of Plaintiff and the Class) ..... 26

VIII. PRAYER FOR RELIEF ..... 28

IX. DEMAND FOR JURY TRIAL ..... 29

Plaintiff International Union of Operating Engineers Local 501 Security Fund ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants Abbott Diabetes Care Inc. and Abbott Laboratories (collectively referred to herein as "Abbott" or "Defendants") based on personal knowledge, publicly available information, and the investigation of counsel, and alleges as follows:

## I. INTRODUCTION

1. This End Payor Class Action is brought by Plaintiff on behalf of itself and a class of similarly situated end payors. This complaint arises from Abbott's systematic concealment of critical manufacturing defects in its FreeStyle Libre 3 and FreeStyle Libre 3 Plus continuous glucose monitoring sensors while simultaneously making false and misleading representations regarding the accuracy, reliability, and safety of these life-sustaining medical devices.

2. Plaintiff and the Class (defined below) seek to hold Abbott responsible for the harms it has caused them as a result of Abbott's improper sales and marketing of its FreeStyle Libre 3 and FreeStyle Libre 3 Plus glucose sensors (collectively, the "Sensors").

3. Abbott manufactured, marketed, distributed, and sold the Sensors as the most accurate continuous glucose monitoring ("CGM") products on the market. Abbott's marketing was directed at patients, prescribers, and payors alike. Yet Abbott failed to disclose material manufacturing defects that adversely impacted the accuracy and reliability of the Sensors' glucose readings. These defects rendered the Sensors worth far less (perhaps even zero) than the price class members paid.

4. Because Abbott concealed material safety information from consumers, and made affirmative misrepresentations, end payors bought the defective Sensors in reliance on the numerous express and implied promises,

representations, assurances, and/or affirmations from Defendants.

5. Abbott's misconduct caused substantial harm and injuries to Plaintiff and Class members across the United States.

6. Plaintiff brings this action individually and on behalf of the Class and seeks actual damages and restitution.

## II. THE PARTIES

7. Plaintiff International Union of Operating Engineers Local 501 Security Fund ("IUOE Local 501 Security Fund") is located in Los Angeles, California and was established for the purpose of providing benefits to thousands of union members and their dependents. Plaintiff provides health benefits, including prescription drug and durable medical equipment ("DME") benefits to covered members and beneficiaries. The IUOE Local 501 Security Fund indirectly paid for and/or provided reimbursement for FreeStyle Libre 3 and/or the FreeStyle Libre 3 Plus Sensors, including defective Sensors, during the Class Period (defined below) purchased in at least California. It is an end payor of the Sensors. Plaintiff's reimbursement decisions were based on Abbott's representations that the Sensors were accurate, safe, reliable, and fit for use in replacing fingerstick glucose testing for diabetes management.

8. Defendant Abbott Diabetes Care Inc. is a Delaware corporation with its principal place of business in Alameda, California. Abbott Diabetes Care Inc. is the division of Abbott Laboratories responsible for designing, manufacturing, marketing, distributing, and selling the FreeStyle Libre family of CGM devices, including the defective Sensors.

9. Defendant Abbott Laboratories is an Illinois corporation with its principal place of business in Abbott Park, Illinois. Abbott Laboratories is the global parent company of Abbott Diabetes Care Inc. and, at all relevant times, was responsible for, and exercised control over, the design, manufacture, marketing,

sale, and post-market surveillance of the defective Sensors.

## III. JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), because this is a class action involving more than 100 class members; the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiff and at least one Class member are citizens of states that differ from Abbott.

11. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12. This Court has personal jurisdiction over Abbott because Abbott Diabetes Care Inc. conducts business in this District and has sufficient minimum contacts with this District. Further, a substantial portion of the conduct giving rise to Plaintiff's claims occurred in this District.

13. Venue is likewise proper as to Abbott in this District pursuant to 28 U.S.C. § 1391(a)(1) and 28 U.S.C. § 1391(b) because a substantial part of the events or omissions complained of herein occurred within this District, and Abbott Diabetes Care Inc. does business in this District.

## IV. FACTUAL ALLEGATIONS

### A. Accurate Glucose Monitoring Is Critical for Effective Diabetes Management

14. Diabetes mellitus is a chronic disease affecting over 40 million Americans.[1] It develops when the pancreas does not make enough insulin or any at all, or when the body is not responding to the effects of insulin properly.[2] Type 2

---

[1] Ctrs. for Disease Control & Prevention, *National Diabetes Statistics Report* (Jan. 21, 2026), www.cdc.gov/diabetes/php/data-research/index.html.

[2] Cleveland Clinic, *Diabetes* (Feb. 17, 2023), https://my.clevelandclinic.org/health/diseases/7104-diabetes.

diabetes is the most common form, representing 90% to 95% of all diabetes cases.[3]

15. Having consistently high blood glucose can cause health problems over time, such as heart disease, nerve damage, and eye issues.[4] Severe low blood glucose (hypoglycemia) can cause complications including blurred or double vision, clumsiness, disorientation and seizures.[5]

16. Monitoring blood sugar (glucose) is key to determining how well a person's current treatment plan is working. It provides information on how to consistently manage diabetes.

17. Inaccurate blood glucose readings can lead to incorrect treatment decisions, potentially causing severe consequences for the patient.[6] Falsely high readings can cause patients to take too much insulin, leading to extreme low blood sugar and symptoms like confusion, dizziness, blurred vision, seizures, loss of consciousness, and coma. Falsely low readings can cause patients to skip or delay their insulin doses, leading to massive hyperglycemia, the production of ketones, and ketoacidosis (DKA), which can be fatal.

18. Glucose levels can be monitored with frequent checks with a glucose meter and fingerstick and/or with a CGM. A glucose meter relies upon a drop of blood from the patient's finger (the traditional fingerprick) being added to a test

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] Manuel Eichenlaub et al., *Impact of Blood Glucose Monitoring System Accuracy on Clinical Decision Making for Diabetes Management*, J. Diabetes Sci. & Tech. (Feb. 28, 2022), https://pubmed.ncbi.nlm.nih.gov/35227125/.

strip.[7] The patient's blood glucose level then appears on the meter's display.[8]

19. Intended to replace fingerprick testing, CGMs are used to provide real-time monitoring of a person's blood glucose levels. A CGM is a device worn on the body, placed there by the individual, and it measures glucose in the fluid between cells, sending continuous, real-time readings to a receiver or smartphone application.[9]

20. Individuals with diabetes, including members of the Plaintiff's plan, and those of the Class, rely on accurate glucose readings to make critical treatment decisions such as insulin dosing calculations, carbohydrate intake determinations, meal and medication choices and timings, and activity choices.

21. Abbott's Sensors are CGMs that are intended to replace blood glucose testing for diabetes treatment decisions. The Sensors also detect trends to aid in the detection of episodes of hyperglycemia and hypoglycemia, facilitating both acute and long-term therapy adjustments. Abbott marketed the Sensors as so accurate that fingerstick confirmation was unnecessary, a central value proposition that justified premium pricing and drove formulary placement by third party payors ("TPPs").

22. Plaintiff's and the Class's plan members, who are Type 1 or Type 2 diabetics or are guardians of diabetics, purchased the Sensors to help manage diabetes. As part of the plan benefits, the Plaintiff and Class members paid for some or all of the purchase price.

23. End payors, including health insurers, self-funded employer plans,

---

[7] Am. Diabetes Ass'n, *The Big Picture: Checking Your Blood Glucose*, Diabetes.org (2024), https://diabetes.org/living-with-diabetes/treatment-care/checking-your-blood-sugar.

[8] *Id.*

[9] Northwestern Medicine Staff, *How Do Continuous Glucose Monitoring Systems (CGMS) Work?*, Nw. Med. (May 20, 2024), http://www.nm.org/healthbeat/healthy-tips/How-Do-Continuous-Glucose-Monitoring-Systems-CGMS-Work.

union health and welfare funds, and other health benefit payors, reimburse the vast majority of the cost of CGM sensors for covered members with diabetes. FreeStyle Libre sensors are typically covered under the pharmacy and DME benefits of commercial health plans. Abbott publicly represents that the Sensors are covered by over 95% of private insurance plans.[10]

**B. Abbott's Design and Marketing of Glucose Monitoring Devices**

24. Abbott marketed the FreeStyle Libre 3 and 3 Plus Sensors aggressively to end payors, as well as to prescribers and patients, as the world's most accurate 14-day CGM system. In 2022, Abbott issued a press release regarding "a new level of glucose monitoring accuracy," touting "Our FreeStyle Libre 3 was recently cleared by the U.S. Food and Drug Administration for use by people with diabetes 4 years and older with a MARD of 7.9% overall, the first CGM to demonstrate a sub-8% value, making it the most accurate 14-day CGM, with readings sent directly to a smartphone every minute."[11]

25. Abbott explained that MARD, the Mean Absolute Relative Difference, is important for diabetes patients because "it is the standard way to measure CGM accuracy" and "in the world of diabetes, that accuracy is critical."[12]

26. Abbott cited its senior director of clinical affairs, Shridhara Alva, regarding the "extremely important" role of accuracy for Abbott's sensors: "It was our job to demonstrate FreeStyle Libre 3's accuracy. It was important to us because taking care of one's diabetes is all about keeping the glucose levels within the recommended range, and the more accurate the glucose readings are, the more

---

[10] Abbott, *Cost and Coverage for FreeStyle Libre Systems*, https://www.freestyle.abbott/us-en/cost.html (last visited Aug. 14, 2026).

[11] *Welcome to the MARD, MARD World of Diabetes Care*, Abbott Newsroom (June 28, 2022), http://www.abbott.com/en-us/corpnewsroom/diabetes-care/welcome-to-the-MARD-world-of-diabetes-care.

[12] *Id.*

confident one is about management of their diabetes."[13] Abbott's Alva was explicit in acknowledging that "[i]f the sensor is inaccurate, misinformation could result in harm. That is what we are determined to avoid."[14]

27. Abbott prominently advertised that the Sensors provide the best accuracy and even touted that the Sensors' efficacy eliminated the need for fingersticks and empowered people with diabetes to be more confident when making important diabetes management decisions.[15]

28. In its limited warranty, Abbott expressly warranted that the Libre 3 Sensors were free from defects in material and workmanship under normal use for a period of one year from the date of manufacture or the original date of purchase, whichever is later.

29. Abbott's formulary and payor-directed marketing also represented that the Sensors had been FDA-cleared, met Good Manufacturing Practice requirements, and were manufactured to the accuracy specifications upon which Abbott's MARD data were based. These representations were false and misleading for the reasons alleged herein.

30. Abbott also represented to payors, through its patient assistance and hub programs, that covered patients would pay between $0 and $75 per month for Sensor coverage, with the bulk of the cost borne by the end payor. These representations induced end payors to place the Sensors on formulary, establish favorable prior authorization criteria, and pay reimbursements at rates reflecting the premium value that accurate, reliable CGM performance commands.

**C. The Manufacturing Defect and Abbott's Prior Knowledge**

31. Beginning no later than 2024, Abbott manufactured FreeStyle Libre 3

---

[13] *Id.*

[14] *Id.*

[15] *See id.*

and Libre 3 Plus Sensors on at least one defective production line at its Alameda, California facility (and/or through contract manufacturers to whom Abbott failed to adequately transfer accuracy performance specifications, as confirmed by the January 23, 2026 FDA Warning Letter).[16] Sensors manufactured on this production line systematically failed to accurately measure interstitial fluid glucose levels, producing inaccurate readings that could lead to dangerous patient treatment decisions, and rendering those sensors essentially worthless and unfit for their intended purpose.

32. In July 2024, Abbott initiated a voluntary recall of FreeStyle Libre 3 Sensors manufactured on this same production line after identifying that certain lots were delivering erroneously high glucose readings.[17]

33. In September 2024, the FDA classified that recall as a Class I Recall for specific lots of Sensors, its most serious designation, finding a reasonable probability that the defective Sensors could cause serious adverse health consequences or death, including severe hypoglycemia, seizures, coma, and permanent neurological injury.[18]

34. Rather than remedying the root cause of the quality failure, Abbott continued to manufacture the Sensors on the same defective production line. Within 18 months, the Sensors from this same line were producing the opposite

---

[16] U.S. Food & Drug Admin., Warning Letter to Abbott Diabetes Care, Inc. (Jan. 23, 2026), http://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/abbott-diabetes-care-inc-722046-01232026.

[17] *Abbott Issues Voluntary Medical Device Correction for a Small Number of FreeStyle Libre® 3 Sensors in the U.S.*, U.S. Food & Drug Admin. (2024), http://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/abbott-issues-voluntary-medical-device-correction-small-number-freestyle-librer-3-sensors-us.

[18] Robert Barrie, *FDA Hits Abbott FreeStyle Libre 3 Recall with Class I Tag*, Med. Device Network (Sept. 6, 2024), http://www.medicaldevice-network.com/news/fda-hits-abbott-freestyle-libre-3-recall-with-class-i-tag/.

inaccuracy: dangerously low glucose readings. This "seesaw" pattern, from dangerously high to dangerously low, demonstrates a systemic failure in Abbott's Quality Management System ("QMS") and a lack of effective Corrective and Preventive Actions ("CAPA") as required by FDA regulations, 21 C.F.R. § 820.100.

35. Abbott identified the November 2025 inaccuracy (of falsely low glucose readings) through its own internal testing and post-market surveillance. As of November 14, 2025, Abbott's own records reflected 736 serious injuries and seven deaths associated with the defective Sensors globally, including 57 serious injuries within the United States.

36. Despite this knowledge, Abbott did not initiate public corrective action until November 24, 2025, and did not issue a public correction until December 2, 2025, when the FDA issued an Early Alert to warn consumers about the defective Sensors and to notify the public of the potentially high-risk device issue.

37. As of January 7, 2026, Abbott had reported 860 serious injuries and seven deaths associated with the defective Sensors.[19]

38. Approximately 3 million Sensors manufactured on the offending production line were distributed in the United States. Abbott has disclosed that approximately 1.5 million of those Sensors had been used or expired by the time the defect was publicly disclosed in November 2025, meaning that Plaintiff and the Class had reimbursed the cost of those Sensors, unknowingly paying for a defective product, before Abbott acknowledged the problem.

39. In contrast to Abbott's assurances throughout its marketing, the FDA

---

[19] *Glucose Monitor Sensor Recall: Abbott Diabetes Care Removes Certain FreeStyle Libre 3 and FreeStyle Libre 3 Plus Sensors*, U.S. Food & Drug Admin. (last updated Feb. 5, 2026), https://www.fda.gov/medical-devices/medical-device-recalls-and-early-alerts/glucose-monitor-sensor-recall-abbott-diabetes-care-removes-certain-freestyle-libre-3-and-freestyle

has determined that the Sensors are defective due to a manufacturing flaw in a production line. The defect causes the Sensors to report falsely low glucose readings, even when users' actual blood glucose levels are normal or even elevated. According to the FDA, these inaccurate readings pose a serious safety risk because they may prompt users to take unnecessary corrective actions or delay appropriate treatment, thereby increasing the risk of severe hypoglycemia, loss of consciousness, seizures, or death.

40. Abbott failed to publicly disclose the defect or initiate a broad corrective action until November 24, 2025, when it issued a recall notice instructing users to "use a blood glucose meter . . . when your sensor readings don't match your symptoms or expectations."

41. Abbott's marketing was fundamentally deceptive because the "no fingerstick" claim was only true when the device functioned perfectly, yet Abbott knew the Sensors did not work and were prone to systemic manufacturing deviations that made fingerstick verification essential for safety.

42. The FDA has advised that affected Sensors should be discontinued and replaced.

43. Abbott's delayed disclosure deprived consumers of important safety information necessary for their evaluation of whether to continue purchasing and using the Sensors.

44. Prior to purchasing the Sensors, Plaintiff's members reviewed and relied on marketing and advertising materials that represented the Sensor to be accurate and reliable. These marketing and advertising materials represented that the Sensor would provide reliable real-time glucose readings, thereby eliminating the need for fingersticks. None of these advertisements or other materials included statements that the Sensors were defective, inaccurate, and at risk for critical alert failures.

45. In reliance on the Defendants' marketing and advertising statements and omissions, Plaintiff's members selected the Sensors paid for in part by themselves and the Plaintiff and members of the Class. Plaintiff, Plaintiff's members, and Class members paid prices based on the value of a device free of material defects. As such, Plaintiff and Class members suffered economic injury and financial harm because they paid more for the Sensor than they should have paid. Abbott's sale of the defective Sensors provided class members with an economic benefit worth far less than the economic benefit for which they had bargained. Had Plaintiff and Class members been aware of this defect, they would not have paid for the Sensors.

### D. The FDA Warning Letter, Findings of Adulteration, and Update on Class I Recall

46. On January 23, 2026, following an inspection of Abbott's Alameda, California facility conducted from October 14-23, 2025, the FDA issued a formal Warning Letter to Abbott Diabetes Care finding that the Sensors are "adulterated" within the meaning of 21 U.S.C. § 351 because the "methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation are not in conformity with the current good manufacturing practice requirements of the Quality System regulation."[20]

47. The Warning Letter identified four specific violations by Abbott:

a. Abbott failed to adequately establish and maintain procedures to ensure that the Sensor design was correctly translated into production specifications, including a failure to establish design transfer procedures for the FreeStyle Libre 3, and a failure to transfer specific glucose sensor accuracy requirements to third-party contract manufacturers responsible for final assembly;

---

[20] U.S. Food & Drug Admin., Warning Letter to Abbott Diabetes Care, Inc., *supra* note 16.

b. Abbott released finished FreeStyle Libre CGM devices without performance-testing them for accuracy after full assembly, sterilization, and programming. Abbott relied instead on upstream, component-level testing performed prior to critical manufacturing steps, a practice the FDA determined does not ensure that finished devices meet accuracy performance requirements at the time of release;

c. Abbott failed to establish statistically valid acceptance criteria and sampling plans to ensure that only conforming finished devices reach the distribution stage; and

d. Abbott failed to validate that its current manufacturing and release controls aligned with the accuracy performance originally approved for the Sensors.

48. The FDA reviewed Abbott's responses to its Form FDA 483 inspection observations (submitted in November and December 2025) and determined that they were "inadequate." The FDA's Warning Letter confirmed that Abbott's systemic manufacturing deficiencies, including its failure to test finished devices for accuracy and the failure to transfer performance specifications to third-party manufacturers, were ongoing issues and remained unresolved as of January 2026.

49. The adulteration finding has significant legal and commercial implications for Plaintiff and the Class end payors. A device that is adulterated within the meaning of 21 U.S.C. § 351 is not lawfully marketable. The end payors that reimbursed adulterated devices received no value for their reimbursements. Instead, they paid a premium price for a product that was not what it purported to be, could not lawfully be sold as represented, and posed unreasonable safety risks to covered members.

50. On February 4, 2026, the FDA provided an update classifying the recall as a Class I Recall, which is the most serious type of recall issued by the FDA, indicating a reasonable probability that using or being exposed to a product will cause serious adverse health consequences or death.[21] This was a separate, much larger Class I Recall for the Sensors due to falsely low readings.

51. Abbott's delayed disclosure deprived consumers of important safety information necessary for their evaluation of whether to continue purchasing and using the Sensors.

**E. The Impact on End Payors**

52. Plaintiff and the Class reimbursed substantial sums for the defective Sensors. The retail price for a 28-day supply of FreeStyle Libre 3 or Libre 3 Plus sensors ranges from approximately $224 to $235, with end payors typically paying the majority of that cost after patient cost-sharing. At scale, meaning across hundreds of thousands of covered members using CGM therapy, the aggregate reimbursements by the end payors for the defective Sensors represent tens of millions of dollars.

53. The defective Sensors were worth less than what Plaintiff and the Class paid for them. A CGM sensor that systematically provides inaccurate glucose readings is not merely a defective consumer product. It is a product that has no value as a diabetes management tool. In fact, it poses an affirmative health risk to the patients for whom coverage was extended. Plaintiff and the Class were harmed at the time they purchased each Sensor at a price far above what it was actually worth, and they are entitled to recover the premium they paid above the actual value of the defective Sensors.

54. Further, Plaintiff and the Class have incurred and will continue to incur the costs of replacing the defective Sensors with alternative CGM devices for

---

[21] *Glucose Monitor Sensor Recall*, *supra* note 19.

affected covered members, including expedited access to alternative CGMs, prior authorization processing for alternative devices, and other operational costs attributable to Abbott's recall.

**F. Fraudulent Omission Allegations**

55. The claims of Plaintiff and the Class members arise out of Abbott's fraudulent concealment of defects to the Sensors, and its representations about their efficacy, accuracy, and quality.

56. Plaintiff alleges that Abbott knew, or was reckless in not knowing, about the defects at all relevant times, specifically at the time Plaintiff and the other members of the proposed Class acquired their Sensors or related accessories—such as overpatches, adhesives, additional test strips, insulin pumps, and/or Freestyle-compliant cell phones—required for the Sensors themselves or necessary because of the Sensors' defects. Abbott had a duty to disclose these defects based on its exclusive knowledge of them and its concealment of them.

57. Plaintiff makes the following specific fraud allegations with as much specificity as possible, absent access to the information necessarily available only to Abbott:

a. Abbott actively concealed the defects from purchasers, as alleged above. Plaintiff is unaware of, and therefore unable to identify, the true names and identities of specific individuals at Abbott responsible for such decisions.

b. Abbott knew, or was reckless or negligent in not knowing, that the Sensors contained the defects. Abbott concealed these defects and made representations about the efficacy, quality, accuracy, and reliability of these monitors.

c. Abbott concealed material information regarding the defects at all times, and it made representations about the efficacy, quality,

and accuracy of the Sensors starting at a time currently unknown to Plaintiff and continuing through the time of sale, on an ongoing basis, to this day, as alleged above. Abbott has still not disclosed the truth about the full scope of these defects to anyone outside of the company. It has taken insufficient actions to inform consumers about the true nature of these defects in the Sensors.

d. Abbott concealed material information regarding the true nature of the defects in every communication it had with the consumers and purchasers about the Sensor, and, particularly, its efficacy, quality, and accuracy. Plaintiff is not aware of any documents, communications, or other items in which Abbott has disclosed the truth about the full scope of the defects in the Sensors to anyone outside of Abbott. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, manuals, or on Abbott's website.

e. Abbott concealed the defects from Plaintiff and the other Class members by making inaccurate representations about the efficacy, quality, and accuracy of the Sensors. Abbott actively concealed the truth about the existence, scope, and nature of the defects from Plaintiff and the other Class members at all times, even though it knew about the defects and knew that information about the defects would be important to a reasonable consumer. Abbott promised in its marketing materials that the Sensors had qualities that they do not have.

f. Abbott actively concealed material information about these defects in the Sensor for the purpose of inducing consumers and

purchasers including members of the Plaintiff's Plan and those of other Class members to acquire the Sensor or related accessories, rather than using competitors' glucose monitors. Had Abbott disclosed the truth, for example in its advertisements or other materials or communications, members of the Plaintiff's Plan and those of other Class members (and any reasonable purchaser) would have been aware of them, and they would not have acquired the Sensor or additional accessories for them, or they would have paid less for them.

58. Defendants had a duty to disclose material facts because: (1) they possessed exclusive knowledge of the defects not known to consumers; (2) they actively concealed the defects while making partial representations (e.g., "no fingersticks," accuracy, reliability, and safety claims) that were misleading absent disclosure; and (3) the defects go to safety—a central characteristic of a medical device—creating a duty to disclose.

## V. TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

59. Any applicable statutes of limitation have been tolled by the discovery rule and Abbott's knowing and active concealment of the defect.

60. Plaintiff and the Class could not, through the exercise of reasonable diligence, have discovered the existence of Abbott's concealed manufacturing defect. The defect was not disclosed by Abbott until November 24, 2025, was classified as a Class I Recall only on February 4, 2026, and was confirmed to be the product of systemic manufacturing failures by the FDA Warning Letter of January 23, 2026. The nature of the defect, which manifested in individual patient readings and not in any publicly available product information, was uniquely within Abbott's knowledge and not discoverable by TPPs.

61. Through no fault or lack of diligence, Plaintiff and the Class were

deceived regarding the defect and could not reasonably discover the defect or Defendants' deception with respect to the defect.

62. Further, Abbott affirmatively and actively concealed the manufacturing defect and the resulting inaccuracy in the Sensors from Plaintiff, the Class, prescribers, patients, and regulators, including by: (a) continuing to market the Sensors as the most accurate CGM available while knowing they were defective; (b) failing to disclose the defect or take corrective action despite tracking hundreds of serious adverse events beginning no later than 2024; (c) failing to adequately respond to the FDA's Form 483 observations; and (d) continuing to distribute and sell defective Sensors after the scope of the defect was known. Abbott is equitably estopped from relying on any limitations defense.

63. For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' active concealment.

## VI. CLASS ACTION ALLEGATIONS

64. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

65. Plaintiff brings all claims as class claims under Federal Rule of Civil Procedure 23. Plaintiff asserts all claims on behalf of the Class, defined as follows:

a. All entities in the United States, its territories, and the District of Columbia that purchased, paid for, or reimbursed the purchase price, in whole or in part, of FreeStyle Libre 3 or FreeStyle Libre 3 Plus Sensors manufactured on the defective production line identified in Abbott's November 2025 recall and the FDA's February 4, 2026 Class I Recall designation, during the period from May 1, 2024 through the date of class certification (the "Class Period").

66. The following persons are excluded from the Class:

a. Defendants and their counsel, officers, directors, management, employees, parents, subsidiaries, and affiliates;

b. All federal and state governmental entities, which do not include cities, towns, municipalities, or counties with self-funded prescription drug plans; and

c. All judges assigned to this case and any members of their staff or families.

67. The proposed nationwide Class meets the requirements of Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and (c)(4).

68. Plaintiff reserves the right to amend the above definition or to add one or more subclasses in subsequent pleadings and motions for class certification.

69. **Numerosity:** Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. Plaintiff is informed and believes that members of the Class are numerous (hundreds of thousands of members). These Class members are widely dispersed throughout the United States. Moreover, given the costs of complex litigation, it would be uneconomic for many Class members to bring individual claims and join them together. While the precise number of Class members is unknown to Plaintiff, the Class is readily identifiable from information and records in the possession of Defendants, third parties, and Class members. As stated above, roughly 3 million FreeStyle Libre 3 and FreeStyle Libre 3 Plus units from the affected production line have been sold in the United States.

70. **Typicality**: Plaintiff's claims are typical of the claims of the Class. Plaintiff and all members of the Class were injured through Abbott's uniform misconduct. The same event and conduct that gave rise to Plaintiff's claims are identical to those that give rise to the claims of every other Class member because Plaintiff and each member of the Class were exposed to the same

misrepresentations and omissions regarding the Sensors and all Class members suffered similar harm as a result of Abbott's uniform conduct.

71. **Adequacy**: Plaintiff is an adequate representative of the Class because the interests of Plaintiff are aligned with, and not antagonistic to, those of other members of the Class. Plaintiff has retained competent counsel who are highly experienced in class action litigation and class action pharmaceutical litigation, in particular. Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously.

72. **Superiority**: A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by many individual Class members may be relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. Even if Class members could afford such individual litigation, the number of claims would create an unnecessary strain on judicial resources. Further, individualized litigation presents the potential for inconsistent or contradictory judgments and would increase the delay and expense to all parties and to the court system, due to the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

73. **Commonality and Predominance**: Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entirety of the Class, thereby making overcharge damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct. Questions of law and fact common to the Class include, but are not limited to:

a. whether Abbott engaged in the wrongful conduct alleged herein;

b. whether Abbott designed, advertised, marketed, distributed, sold, or otherwise placed the Sensors into the stream of commerce in the United States;

c. whether Abbott's alleged conduct violates applicable law;

d. whether Abbott misled Class members regarding the quality, benefits, and/or risks of the Sensors;

e. whether Abbott had actual or imputed knowledge of the alleged defects of the Sensors and failed to disclose such defects and/or their risks to Plaintiff and other Class members;

f. whether Abbott's actions, inactions, and practices complained of herein breached express warranties;

g. whether Abbott's actions, inactions, and practices complained of herein breached the implied warranty of merchantability;

h. whether Abbott's actions, inactions, and practices complained of herein constituted fraudulent omission;

i. whether Plaintiff and Class members were damaged by Defendants' conduct;

j. whether Abbott was unjustly enriched; and

k. whether Plaintiff and the Class overpaid for their Sensors as a result of the defects alleged herein.

## VII. CAUSES OF ACTION

### COUNT ONE:

### FRAUDULENT OMISSION OR CONCEALMENT
### (On Behalf of Plaintiff and the Class)

74. Plaintiff incorporates by reference the previous allegations as though fully set forth herein.

75. Plaintiff asserts this claim for common law fraud under an omission or

concealment theory.

76. Abbott was aware of the Sensors' defects mentioned above when it manufactured, marketed, and sold the devices to Plaintiff, Plaintiff's members, and the Class members.

77. Being aware of the Sensors' defects and knowing that Plaintiff and the other Class members could not have reasonably been expected to know about them, Abbott had a duty to disclose the defects to Plaintiff and the other Class members in connection with the sale of the Sensors, as these defects relate to important safety issues with devices that are used for managing diabetes, a disease that can be life-threatening.

78. Defendants had a duty to disclose material facts because: (1) they possessed exclusive knowledge of the defects not known to consumers; (2) they actively concealed the defects while making partial representations (e.g., "no fingersticks," accuracy, reliability, and safety) that were misleading absent disclosure; and (3) the defects go to safety—a central characteristic of a medical device—creating a duty to disclose.

79. Abbott did not disclose the defects to Plaintiff and the other Class members in connection with the sale of the Sensors and/or subsequent sales of Sensors.

80. Abbott knew that these omissions would cause the false impression that the Sensor did not have the aforementioned defects.

81. The defects were material to the sale of the Sensors and sale of related products. Abbott failed to disclose defects that can result in malfunctions, including but not limited to inaccuracies in glucose readings.

82. The existence of these defects are material facts that a reasonable person would have considered in deciding whether or not to choose, purchase (or to pay the same price for) the Sensors and/or additional items for the Sensor. In

purchasing the Sensors and related products, Plaintiff and the other Class members, who planned to use the Sensor for diabetes management, reasonably and justifiably relied on Abbott to disclose known material defects with respect to the Sensors. Only Abbott had the relevant information about these defects, and Plaintiff and the other Class members would not have known of these defects otherwise.

83. Had Plaintiff and the other Class members known of the defects, they would not have purchased the Sensors, would have paid less for the devices, or would not have purchased additional items required for the Sensor itself or necessary because of the Sensor's defects.

84. Through their omissions regarding the defects, Abbott intended to induce, and did induce, Plaintiff and the other Class members to purchase Sensors they otherwise would not have purchased, or to pay more for Sensors and related products than they otherwise would have paid.

85. As a direct and proximate result of Abbott's omissions, Plaintiff and the other Class members either overpaid for the Sensors or would not have purchased the Sensors and/or additional required items if the defects had been disclosed.

86. Plaintiff and the other Class members have incurred damages—including but not limited to actual damages, compensatory damages, restitution, equitable relief, statutory damages and penalties, and punitive and exemplary damages—in an amount to be determined at trial.

**COUNT TWO:**

**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class, in the Alternative)**

87. Plaintiff incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

88. Plaintiff and the Class bring this claim in the alternative to all other claims and remedies at law.

89. Through and as a result of Plaintiff's and Class members' use of Abbott's products, Abbott received monetary benefits.

90. Abbott has benefited from selling at an unjust profit defective FreeStyle CGMs that had artificially inflated prices due to Abbott's concealment of defects, and Plaintiff and the other Class members have overpaid for these devices.

91. Abbott, upon information and belief, has therefore engaged in opportunistic, unethical, and immoral conduct by profiting from Sensors that it knew were defective or highly subject to defect.

92. As such, it would be inequitable, unconscionable, and unlawful to permit Abbott to retain the benefits it derived as a consequence of its wrongful conduct.

93. Accordingly, Plaintiff and the Class are entitled to relief in the form of restitution and disgorgement of all ill-gotten gains, which should be put into a common fund to be distributed to Plaintiff and the Class.

## COUNT THREE:

## BREACH OF EXPRESS WARRANTY
**(On Behalf of Plaintiff and the Class)**

94. Plaintiff incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

95. Abbott made express warranties to Plaintiff, the Class, prescribers, patients, and the public that the defective Sensors: (a) achieved an overall MARD of 7.9%, making them the most accurate 14-day CGM available; (b) were free from defects in material and workmanship under normal use for a period of one year from manufacture or original purchase; (c) were manufactured in accordance with FDA-cleared specifications; (d) were suitable to replace fingerstick blood glucose testing for diabetes treatment decisions; and (e) were safe, effective, and reliable for their intended use.

96. These representations were incorporated into the Sensors' product labeling, user manuals, marketing materials, and Abbott's press releases, and became part of the basis of the bargain between Abbott and Plaintiff and Abbott and the Class.

97. Abbott breached these express warranties. The defective Sensors did not meet Abbott's stated MARD specifications; were not free from manufacturing defects; were not manufactured in conformity with FDA-cleared specifications; were not suitable to replace fingerstick testing; and were not safe, effective, or reliable for their intended use.

98. As a direct and proximate result of Abbott's breach of express warranty, Plaintiff and the Class were damaged in an amount to be determined at trial.

## COUNT FOUR:

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
**(On Behalf of Plaintiff and the Class)**

99. Plaintiff incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

100. Abbott is a merchant with respect to the defective Sensors within the meaning of U.C.C. § 2-104. In connection with the sale of the defective Sensors, Abbott impliedly warranted that the Sensors were merchantable, i.e., fit for the ordinary purpose for which CGM sensors are used. That purpose was to accurately monitor blood glucose levels in diabetic patients to support safe and appropriate treatment decisions.

101. The defective Sensors were not merchantable. They systematically provided inaccurate glucose readings, were adulterated within the meaning of federal law, and were incapable of performing their essential purpose of accurately monitoring glucose levels. The defective Sensors were therefore unfit for their

ordinary purpose.

102. As a direct and proximate result of Abbott's breach of the implied warranty of merchantability, Plaintiff and the Class were damaged in an amount to be determined at trial.

**COUNT FIVE:**

**VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT ("CLRA") – Cal. Civ. Code § 1750, *et seq*. (On Behalf of Plaintiff and the Class)**

103. Plaintiff incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

104. This cause of action is brought pursuant to the CLRA, Cal. Civ. Code § 1750, et seq. Plaintiff and each member of the proposed Class are "consumers" as defined by Cal. Civ. Code § 1761(d). Abbott's sale of the Sensors to Plaintiff and the Class were "transactions" within the meaning of Cal. Civ. Code § 1761(e). The Sensors purchased by Plaintiff and the Class are "goods" within the meaning of Cal. Civ. Code § 1761(a).

105. Defendants violated the CLRA by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiff and the Class that were intended to result in, and did result in, the sale of their merchandise: (1) advertising goods or services with intent not to sell them as advertised; and (2) making false or misleading statements of fact concerning the safety and efficacy of the Sensors.

106. Plaintiff and the Class have suffered damage as a result of the use or employment by Defendants of a practice declared to be unlawful by § 1770(a) and seek to recover the following: (1) restitution of the money paid for the Sensors, which Plaintiff and the Class would not have bought or would have paid less for

had they known of the defects; (2) an order enjoining Abbott's deceptive practices; and (3) any other relief that the court deems proper.

**COUNT SIX:**

**VIOLATION OF THE MAGNUSON MOSS FEDERAL WARRANTY ACT 15 U.S.C. § 2301, *et seq*. (On Behalf of Plaintiff and the Class)**

107. Plaintiff incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

108. The Sensors constitute "consumer products" as defined in 15 U.S.C. § 2301(1).

109. The Sensors are tangible personal property owned by Plaintiff and the members of the Class.

110. The Sensors were distributed in commerce.

111. The Sensors are normally used for personal and/or household purposes, in that they are used by individual persons for monitoring glucose levels, often in the home. This is a personal purpose because it is a purpose related to the person or the body.

112. Plaintiff and the members of the Class are "consumers" as defined in 15 U.S.C. § 2301(3).

113. Plaintiff and the members of the Class are buyers or lessors of the Sensors, and/or are persons to whom the Sensors were transferred during the duration of implied and written warranties applicable to the Sensors, and/or are persons entitled by the terms of those warranties, and by applicable State law, to enforce against Abbott the obligations of the warranties.

114. Abbott is a "supplier" of the Sensors as defined in 15 U.S.C. § 2301(4).

115. Abbott is or was engaged in the business of making the Sensors, which

are consumer products, and of making other consumer products, directly or indirectly available to consumers, including through its subsidiaries and third-party distributors.

116. Abbott is a "warrantor" as defined in 15 U.S.C. § 2301(5).

117. Abbott is a supplier or other person: (a) who gave or offered to give a written warranty applicable to the Sensors; and/or (b) who is or may be obligated under an implied warranty applicable to the Sensors.

118. As discussed above, Abbott made numerous express and implied warranties to Plaintiff and members of the Class with respect to the Sensors.

119. The warranties made by Abbott pertained to consumer products costing the consumer more than five dollars. *See* 15 U.S.C. § 2302(e).

120. Plaintiff and the members of the Class invoke federal jurisdiction for the claims stated under this Count pursuant to the Class Action Fairness Act.

121. The Sensors were defective when they came off Abbott's assembly lines and at all subsequent times (including at the times of sale and/or delivery to Plaintiff and the members of the Class) because the defective design made them dangerously unsafe.

122. As a result, the Sensors were worth nothing at the time of their sales.

123. Plaintiff and the members of the Class would not have purchased or accepted the Sensors had they known the machines were dangerously defective.

124. Abbott violated the Magnuson-Moss Federal Warranty Act by failing to comply with the express warranties they made to Plaintiff and the members of the Class. Abbott also violated the Magnuson-Moss Federal Warranty Act by failing to comply with the implied warranties they made to Plaintiff and the members of the Class.

125. Plaintiff and the other members of the Class need not have given notice of the defects to Abbott and an opportunity for Abbott to comply with their

warranty obligations prior to the filing of this suit because Plaintiff may give such notice to Abbott on their own behalf and on behalf of the Class after class certification pursuant to 15 U.S.C. § 2310(e).

126. Based on the facts alleged here, any durational limit to the warranties that would otherwise bar the Magnuson-Moss Federal Warranty Act claims in this Count are procedurally and substantively unconscionable and otherwise unenforceable under federal law and applicable state common law.

127. Based on the facts alleged here, any durational limit to the warranties that would otherwise bar the claims in this Count is tolled under equitable doctrines.

128. Plaintiff and the members of the Class sustained injuries and damages as a proximate result of Abbott's violation of its express and implied warranties, and are entitled to legal and equitable relief against Abbott, including compensatory damages consisting of: the difference between the values of the Sensors as warranted (their prices) paid and their actual values at the time of purchase or lease ($0.00), or the cost to replace the Sensors; and rescission or other miscellaneous incidental and consequential damages. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and the other members of the Class are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by them in connection with the commencement and prosecution of this action.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Class pray for judgment against Abbott as follows:

A. An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class

counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

B. A judgment that Abbott engaged in the wrongful conduct alleged herein;

C. A judgment in favor of Plaintiff and the Class awarding them appropriate monetary relief, including actual damages, restitution, attorneys' fees, expenses, costs, and such other and further relief as is just and proper;

D. An order requiring Abbott to pay the costs involved in notifying the Class members about the judgment and administering the claims process;

E. A judgment in favor of Plaintiff and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs and expenses as allowable by law; and

F. An award of such other and further relief as this Court may deem just and proper.

## IX. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 14, 2026

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: */s/ Henry Huttinger*
Henry Huttinger (SBN 312843)
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
henry.huttinger@hbsslaw.com

Thomas M. Sobol*
Greg Arnold*
**HAGENS BERMAN SOBOL SHAPIRO LLP**
One Faneuil Hall Square, 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
tom@hbsslaw.com
grega@hbsslaw.com
**pro hac vice* applications forthcoming

Nathan W. Bear (SBN 247042)
Frank R. Schirripa*
Gwendolyn Nelson*
**HACH ROSE SCHIRRIPA & REHNS LLP**
112 Madison Avenue, 10th Floor
New York, NY 10016
Telephone: (212) 213-8311
nbear@hrsrlaw.com
fschirripa@hrsrlaw.com
gnelson@hrsrlaw.com
**pro hac vice* applications forthcoming

James R. Dugan, II*
David S. Scalia*
Monica M. Vela-Vick*
**THE DUGAN LAW FIRM APLC**
365 Canal Street
One Canal Place, Suite 1000
New Orleans, LA 70130
Telephone: (504) 648-0180
Facsimile: (504) 648-0181
jdugan@dugan-lawfirm.com
dscalia@dugan-lawfirm.com
monica@dugan-lawfirm.com
**pro hac vice* applications forthcoming

*Counsel for Plaintiff and the Proposed Class*